**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 10-20581

JOHN WILSON and LARI ZEKA,

Defendants.

/

**ORDER OVERRULING MAGISTRATE JUDGE'S ORDER AND GRANTING MOTION TO DISQUALIFY**

On October 15, 2010, the Government filed a motion to disqualify Attorney Scott Neumann as counsel for Defendant John Wilson. The motion was referred to Magistrate Judge Mark A. Randon, who subsequently denied it. The Government timely appealed the decision to this court, and the court heard argument on the appeal on January 5, 2011. After carefully reviewing the submitted materials, the court must overrule the Magistrate Judge and grant the Government's motion.

## I. BACKGROUND

The Magistrate Judge accurately summarized the background allegations in this case. In a 71-count Indictment, the Government alleges that from September 2000 to September 2010, Defendant John Wilson engaged in a scheme to defraud prisoners and their families out of approximately $2.6 million dollars through operation of three businesses: University Legal Services, LLC ("ULS"), University Research Services ("URS"), and Appellant Research Services, LLC ("ARS"). Defendant Lari Zeka was apparently an employee of ARS and URS. According to the Indictment, Defendants Zeka and Wilson, under the names of Wilson's businesses, sent brochures and mailings

to prison inmates offering to conduct legal research and appellate work on their behalves. When prisoners or their family members responded to these mailings, Defendants would request funds in two stages: first for legal research and then for attorney retainers. The Government alleges that after funds were provided for the second stage, Defendants would cease contact with their "clients." The Indictment alleges, in general, that Defendants either failed to provide legal research, or provided research that was not useful, failed to locate attorneys for the prisoners, failed to provide refunds, and unlawfully held themselves out to be attorneys. The Indictment asserts sixty counts of mail fraud (18 U.S.C. § 1341) against Defendants Wilson and Zeka; six additional counts of mail fraud against Defendant Wilson solely; four counts against Defendant Wilson for failure to file a federal income tax return (26 U.S.C. § 7203); and one count of being a felon in possession of a firearm against Defendant Wilson (18 U.S.C. § 922(g)(1)).

Since the spring of 2006, Attorney Scott Neumann has represented URS and ARS in connection with complaints made to various state agencies. The Government contends that Neumann's representation of Wilson's businesses should disqualify him from acting as counsel in this matter.

## II. STANDARD

The instant motion was referred to the Magistrate Judge under 28 U.S.C. § 636(b)(1)(A), which allows district judges, subject to certain exceptions, to "designate a magistrate judge to hear and determine any pretrial matter pending before the court." This section also allows for a form of "appeal" from the Magistrate Judge's determination, allowing the district court to "reconsider any pretrial matter under this

subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *Id.*

The court is given "wide latitude" in making the determination of whether to disqualify counsel, which is reviewed on appeal "generous[ly]." *United States v. Swafford*, 512 F.3d 833, 839 (6th Cir. 2008) (quoting *United States v. Mays*, 69 F.3d 116, 121 (6th Cir. 1995)). The court's decision will be upheld unless "arbitrary" or "without adequate reasons." *Id.* (quoting *Mays*, 69 F.3d at 121).

## III. DISCUSSION

The Magistrate Judge accurately set forth the law relating to conflict-free representation, and the court restates it here.

> The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoythe right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. One element of the Sixth Amendment right to counsel is the right of a defendant, who does not require appointed counsel, to choose who will represent him or her. *See U.S. v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)). Indeed, "[t]he Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Id.*
>
> The right to counsel "is circumscribed in several important respects," however, and does not extend to an attorney laboring under an actual conflict of interest. *Wheat*, 486 U.S. at 159, 162. The Court "must recognize a presumption in favor of petitioner's counsel of choice;" however, "that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Wheat*, 486 U.S. at 164. Even where a defendant wishes to waive his right to conflict-free counsel, trial court retain[s] the authority to disqualify counsel "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat*, 486 U.S. at 163; *United States v. Swafford*, 512 F.3d 833, 839 (6th Cir. 2008).

> Such discretion to disqualify counsel is warranted, moreover, because of the "whipsaw" nature of the waiver of conflict-free representation: "If a trial court disqualifies counsel, [the] defendant will argue . . . a violation of his Sixth Amendment right to counsel of his choice. If a trial court refuses to disqualify an attorney, a defendant may later attempt to raise an ineffective assistance of counsel claim based on conflict of interest, asserting that his waiver was not knowingly or voluntarily made." *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1353-54 (6th Cir. 1993) (citing *Wheat*, 486 U.S. at 161-62).

(11/23/10 Order at 4-5.) The court is cognizant that, in certain cases "the Government may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side" and that trial courts should be "aware of this possibility, and must take it into consideration along with all of the other factors which inform this sort of a decision." *Wheat*, 486 U.S. at 163. There is, however, no evidence that the Government is manufacturing a conflict here.[1]

In his November 23, 2010, order, the Magistrate Judge denied the Government's motion, and specifically rejected the following arguments which the Government advanced in support of disqualification: (a) Defendant Wilson may elect to present an "advice of counsel" defense, resulting in Attorney Neumann becoming an unsworn witness during trial and/or requiring Attorney Neumann to become an actual witness at trial; (b) Attorney Neumann's own interests in protecting himself and his professional reputation directly conflict with Defendant Wilson's interests and could adversely impact the advice Attorney Newmann will offer to Defendant Wilson; and (c) the Michigan

[1]At the hearing Neumann stated that, although he has tried many cases, he has never tried a case in federal court. Neumann may be an experienced trial attorney in general terms, but his utter lack of experience in federal court suggests that the Government's efforts to disqualify him here are not motivated by an inappropriate desire to rid itself of a "particularly able defense counsel."

Rules of Professional Conduct prohibit an attorney from representing a client where a conflict of interest is present and where an attorney may be called as witness.

The Government appeals these decisions, arguing that the Magistrate Judge clearly erred in his November 16, 2010, Order. The court agrees with the Government, and finds that Neumann must be disqualified from representing Wilson in this action because of the potential for an advice of counsel defense as well as for Neumann's likely status as an unsworn witness if he were to continue as defense counsel.

With respect to the advice of counsel defense, the Magistrate Judge first noted that the Government relied on "an alleged statement of Defendant Zeka." (*Id.* at 5, citing Gov't's Mot. Ex. A.) Indeed, the Government submitted *three* documents entitled "Memorandum of Interview" to its initial motion to disqualify. The first "Memorandum of Interview," dated November 5, 2009, is the one that the Magistrate Judge cited, and it summarizes an interview conducted of Defendant Zeka by two U.S. Postal Inspectors. The memorandum indicates that, according to Zeka, Wilson "assured [Zeka] the business plan was reviewed by [Wilson's] attorney Scott Neumann. Neumann drafted all the business contracts and approved of all the business forms. Zeka said he met Neumann one time when the business was out in Birmingham. Zeka said the contract that is used by the business and sent out to clients was created by Scott Neumann." (Gov't's Mot. Ex. A at 2.)

In the second "Memorandum of Interview," attached to the Government's motion, the interviewers noted that Zeka informed them that, when he raised concerns about the quality of the research to Wilson, Wilson "reminded Zeka he had talked to his attorney, Scott Neumann[,] and as long as they sent the research the quality of the research did

not matter." (Gov't's Mot. Ex. B at 2.) According to the interview notes, Zeka said that clients complained more about the attorney retainer fee than about the research, and when Zeka questioned Wilson about it, "Wilson always assured Zeka that they (Zeka and Wilson) were fine because everything had been run through Scott Neumann." (*Id.* at 3.)

The third "Memorandum of Interview," dated November 5, 2009, summarizes an interview with Defendant Wilson. Wilson purportedly told the interviewers that his attorney, Scott Neumann, "drafted the contracts and other paperwork for ARS." (Gov't's Mot. Ex. C at 2.)

In addition to these memoranda, the Government also submitted to the Magistrate Judge evidence regarding Neumann's representation in 2006: a series of letters between Neumann and the State Bar of Michigan relating to the State Bar's concerns with the business operations of ARS. In his order, the Magistrate Judge referred to this evidence in stating that the only evidence presented to the court regarding Neumann's participation in Wilson's businesses occurred in 2006. First, on April 18, 2006, Neumann wrote a letter to the State Bar of Michigan in which he stated that he had been retained by URS to respond to the State Bar's concern that URS was engaged in the unauthorized practice of law. (Gov't's Mot. Ex. D.) He requested forty-five days to review the matter, and stated that in the meantime URS would not accept any new clients. (*Id.*) Neumann followed up with a June 28, 2006 letter, in which he suggested changes to URS's literature and practices in order to alleviate the concerns of the State Bar. (Gov't's Mot. Ex. E.) The Magistrate Judge found that "[o]ther than the proposed language reflected in Attorney Neumann's June 28, 2006 letter, it does

not appear that Attorney Neumann drafted any other contract, literature, or other paperwork relating to the URS/ARS business or business plan." (11/23/10 Order at 7.)

The Magistrate Judge proceeded to analyze the Government's "advice of counsel" argument based on this premise. The Government contends in its appeal that Neumann's role was more substantial than one, isolated representation and that the Magistrate Judge clearly erred in relying only on the 2006 letters in determining the scope of the representation. Based on the information presented to the court, and, in particular, on information which appears to have come to light after the Magistrate Judge's hearing, the court finds that, when the entire record is taken into account, a denial of the Government's motion amounts to clear error.

In addition to the three memoranda of interviews, and the letters referenced by the Magistrate Judge, the Government also presented letters stretching into 2008 between the State Bar of Michigan and Neumann. In addressing the advice of counsel issue, the Magistrate Judge seems to have narrowly focused on Neumann's role in drafting the documents of Wilson's businesses, and lost sight of Neumann's larger role in advising the businesses. The advice of counsel defense, if raised in this case, may be broader than the drafting of documents. "The elements of a reliance on counsel defense are (1) full disclosure of all pertinent facts to counsel, and (2) good faith reliance on counsel's advice." *United States v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994) (citing *United States v. Duncan*, 850 F.2d 1104, 1116 (6th Cir. 1988)). Here, the relevant inquiry is into Neumann's role in the businesses, not only in helping to draft business documents, but also in shaping the direction of those businesses, fending off complaints and, most pertinently, in advising the businesses generally. Here, through

Neumann's numerous interactions with the State Bar, the court can glimpse Neumann's role particularly in advising the businesses about responding to and defusing customer complaints by, among other things, changing certain business practices.

For example, the State Bar wrote to Neumann on July 26, 2006, stating that Neumann's proposals (found in his June 28, 2006, letter) would be an improvement over the previous advertising and communications sent to inmates, and providing a few additional suggestions relating to, among other things, the types of documents received from URS's clients, the alleged lack of communication with clients, possible instances of false and misleading advertising, and the improper practice of promising attorney referrals. (Gov't's Mot. Ex. F.) The State Bar wrote again a month later, following up the July 26, 2006, letter and a subsequent telephone conversation in which Neumann had assured the State Bar that he would advise his clients to return certain documents (legal transcripts) to their customers. (Gov't's Mot. Ex. H.) The letter informed Neumann that refunds should be made to three of URS's customers for unperformed services. (*Id.*) The State Bar sent a similar letter a month later. (Gov't's Mot. Ex. G.) The State Bar sent Neumann another letter on September 13, 2007, relating to a customer complaint that URS had deceptively agreed to provide legal services to entice a payment from the customer, and then later refused to refund the money when URS offered only research. (Gov't's Mot. Ex. I.) Neumann also wrote to the State Bar on March 14, 2008, confirming a telephone conversation and stating that he would be representing ARS in connection with the State Bar's March 12, 2008 letter. (Gov't's Mot. Ex. J.)

Based on these exhibits, it is clear that Neumann had an extensive and continuing role in the business affairs of ARS and URS from the spring of 2006 through the spring of 2008. He consistently aided Wilson's companies in responding to customer complaints regarding exactly the types of misconduct alleged in the indictment. It requires no great leap to reach the inference that he was also advising Wilson in how to respond to such complaints.

During the hearing before this court, counsel for the Government proffered, and Neumann did not dispute, that in addition to representing Wilson's businesses in response to client or State Bar complaints in the State of Michigan, Neumann also represented Wilson's businesses in multiple other jurisdictions. Neumann's representation of Wilson's businesses in those jurisdictions was entirely within the time-frame at issue in the Indictment, and entirely related to the business affairs of the entities at issue in the Indictment. While Neumann attempts to minimize his involvement with Wilson's businesses, it is clear to the court that on numerous occasions he provided extremely important legal services to Wilson and his businesses, and that those services directly related to the fraudulent enterprise alleged in the Indictment.

The first exhibit submitted by the Government at the hearing was a July 7, 2009, letter sent by Neumann to the Ohio Attorney General. In the letter, Neumann indicated that he represented ARS in the State of Michigan, and explained the nature and business purpose of ARS. Neumann stated that ARS "provides its customers with access to legal citations and cases stored on the Lexis-Nexis database for a fee." (Hrg. Ex. 1 at 1.) He explained how this is accomplished, and then summarized that ARS

"provides its customers with the ability to search for legal cases on the Lexis-Nexis database." (*Id.*) The letter then continued to substantively respond to specific complaints raised by customers, or clients, of ARS. The complaints related to the quality and extent of the services provided by ARS, including apparent allegations that ARS agreed to, but did not, "bring [a client's] case to court," or agreed to, but did not, "get [a client] release[d] early," or, for several clients, accepted money without providing any legal research. Neumann's July 6, 2009, letter responds to these allegations by explaining, in detail, how the terms of the relevant contracts limited ARS services to "research only," how partial refunds were issued, and how ARS could not perform legal research if the clients did not return certain forms to ARS. (*Id.*) Neumann's letter, in short, addresses the very types of behavior at issue in the Indictment, during the relevant time-frame.

The Government's Exhibit 2 from the hearing is a May 15, 2009, "Investigative Report" prepared by Investigator Massa of the Ohio Attorney General's Office, Consumer Protection Section. The Report indicates that Scott Neumann called the office regarding a letter sent to ARS dated May 5, 2009, regarding apparent violations of ARS and URS relating to Ohio's "failure to deliver" rule. (Gov't's Hrg. Ex. 2.) The Investigator reports that Neumann relayed ARS's position regarding a refund purportedly due to one of ARS's clients for overdue research. (*Id.*) Again, the substance of Neumann's representation relates to the type of conduct at issue in the current criminal case.

During the hearing, Neumann also acknowledged that he also communicated with the State Bars of, at least, Arkansas and North Carolina in response to client

complaints regarding his client. He stated that he also had in his possession a document directed to the State Bar of Florida, which Wilson had given to him at some unspecified time. Based on the court's questioning of Neumann at the hearing, it is undeniable that, during the scope of the activity alleged in the Indictment, Neumann was retained by Defendant Wilson to represent the businesses referenced in the Indictment. Neumann's representation included proposed redrafts of business plans and documents (as exhibited in the June 28, 2006, letter) and multiple communications with administrative and investigative agencies of at least four states: Michigan, Ohio, North Carolina, and Arkansas. Despite Neumann's current insistence that his role was of minimal importance, Neumann was nonetheless retained to manage and respond to serious allegations of the exact type of misconduct alleged in the indictment. It is equally clear, by logical inference, that Neumann was actively engaged in providing advice to his client about the business activities of Wilson's companies. Neumann's role in Wilson's companies, therefore, was material and was designed to persuade several state agencies that Wilson's activities were largely proper and that to the extent they were not, Neumann would be advising his client how to alter his activities, to return disputed documents, or to amend the business documents. And, again, while Neumann attempts to minimize the importance of his role, it is evident that Neumann's role served vital business interests of Wilson's companies, with the specific design of persuading state agencies to allow those business to continue unimpeded.

With this factual background, the implications on the potential of an advice of counsel defense are apparent. An advice of counsel defense would be available to any defendant in Wilson's position should he choose to assert it. Presenting such a defense

with the advising attorney in the position of trial counsel would give rise to the most obvious conflict of interest.

Neumann argues however, that after full consultation with both himself as well as an independent, well respected, federal defense attorney, Defendant Wilson has chosen to prospectively waive any possible advice of counsel defense. The problem with this argument, however, is that at this juncture in the litigation, and while actively represented by Neumann, it is not possible for a client to knowingly and intelligently waive his right to present such a defense. At this stage in the litigation, the facts are as yet unclear, and the trial strategy of the Government is unknown. At any moment, the landscape of the litigation could change and Wilson could determine that an advice of counsel defense is exactly the course of action he needs to pursue. Indeed, in reviewing Wilson's statements during the Magistrate Judge's hearing, Wilson himself acknowledged that it was "very difficult at this time" to discuss strategies and defenses. (Gov't's Appeal Ex. 2 at 50.) He stated that "as of right now" his confidence with Neumann was "110 percent," but he stressed that it was early in the litigation and that he did not have all the discovery yet. (*Id.*) Moreover, even with the added insulation of having Wilson discuss the issue with an independent defense attorney, it is difficult for the court to imagine how Wilson, under the peculiar facts of this case, could make a knowing and intelligent waiver, prospectively, of an advice of counsel defense while still being actively represented by the attorney on whose advice he may have relied.

Moreover, even if Wilson has waived the right to present an advice of counsel defense, the court is not convinced that he has adequately waived his right to conflict-free representation, as the Magistrate Judge found (11/23/10 Order at 11), because of

Wilson's equivocal statements that it was "very difficult" to make such decisions at this time, and that his confidence in Neumann was great "as of right now." (Gov't's Appeal Ex. 2 at 50.)[2]

In any event, even if Wilson has knowingly and intelligently waived both an advise of counsel defense and his right to conflict-free representation, the court is not *required* to accept such waivers. *Swafford*, 512 F.3d at 839. ("Whether the client waives his right to conflict-free representation is not dispositive."). This is because "[t]he question of disqualification . . . implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial." *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993) (citing *Wheat*, 486 U.S. at 160.) "In situations where a potential conflict of interest may arise, the court's interest in the integrity of the proceedings may trump the defendant's choice." *Swafford*, 512 F.3d at 839. Not only may the court reject the waiver, the court may appropriately do so in pretrial proceedings, without being fully advised of all the relevant facts:

---

[2] It remains unclear to the court, in fact, whether Wilson asserts he has waived his right to conflict-free representation. The Magistrate Judge found that he had, but Neumann's appeal brief as well as his argument at this court's hearing focuses on the waiver of the advice of counsel defense, rather than the waiver to conflict free-representation. Neumann asserts that there is no conflict in this case, actual or potential. For purposes of this order, the court will assume that Wilson at least attempted to waive his right to conflict-free representation. Ultimately, it does not affect this court's analysis. It is generally true that a defendant can waive his right to conflict-free representation. *See United States v. Davis*, 490 F.3d 541, 548 (6th Cir. 2007) ("A defendant may make a knowing, intelligent, and voluntary waiver of [his] right to conflict-free counsel, and a defendant has a Sixth-Amendment right to counsel of [his] choice." (citing *United States v. Straughter*, 950 F.2d 1223, 1234 (6th Cir. 1991)). But, as discussed above, there are situations, such as those presented here, in which the court is not required to accept that waiver.

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.
>
> For these reasons we think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, *but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses*.

*Wheat*, 486 U.S. at 162-63 (emphasis added).

The court is persuaded that the interests in preserving the integrity of the proceedings, ensuring a fair trial and, additionally, protecting the rights of Defendant Wilson overcome the presumption in favor of Wilson's chosen counsel and require that the court disqualify Neumann. Contrary to Defendant's argument and the Magistrate Judge's conclusion, this case is remarkably similar to *Swafford*, in which the Sixth Circuit upheld the district court's disqualification of chosen counsel, even after Defendant had waived his right to an advice of counsel defense. *Swafford*, 512 F.3d at 833. In *Swafford*, the district court disqualified the defendant's attorney because he was a member of the same firm as Defendant's previous attorney, whose advice could have

given rise to an advice of counsel defense. *Id.* at 839. The Sixth Circuit summarized the district court's analysis:

> The judge acknowledged that Swafford was prepared to waive this defense and that his counsel did not believe that their representation would be adversely affected. Nevertheless, he granted the motion on the grounds that during the course of the trial, the government might offer evidence leading the defendant to testify, which, in turn, might implicate the conflict of interest within the firm. This potential, the court concluded, required resolution of the issue before the trial because "the stakes are so high" (e.g. mistrial, replacing counsel).

*Id.* at 839-40 (internal citations omitted). With this background, the Sixth Circuit found that "[t]he district court appropriately recognized its obligation to balance the defendant's right to counsel of choice with the court's independent obligation to serve justice." *Id.* at 840.

The Magistrate Judge distinguished *Swafford* on two bases, but the court finds both of these bases to be unpersuasive. First, the Magistrate Judge found that *Swafford* is distinguishable because in that case the attorney had actually advised his client that it was legal to commit the relevant illegal activity, whereas in this case there is no evidence that Neumann advised his client to commit any of the illegal activity alleged in the indictment. In effect, the Magistrate Judge thus ruled that whether Neumann should be disqualified depended on the merits of Wilson's potential advice of counsel defense, which in turn depends on the legality of Neumann's advice. Both propositions miss the mark. It is the potential *invocation* of the defense, rather than its probable success which gives rise to the conflict of interest. The court should not be required to rule on the legitimacy of the defense this far in advance of trial in order to determine whether to disqualify Neumann. As stated in *Swafford* and in *Wheat,* in order to secure the interests of justice, the court is sometimes, by necessity, required to rule on these

issues in advance of trial before the record is fully developed. *See Wheat*, 486 U.S. at 162-63; *Swafford*, 512 F.3d at 840. Moreover, as the Government points out, the advice of counsel defense can be utilized to negate the mens rea of an offense even if Neumann did not advise that Wilson do anything illegal (and, to be sure, Neumann repeatedly emphasizes in argument and briefing that he did no such thing). So long as Wilson could allege that he fully disclosed the relevant facts, and relied in good faith on that advice, an advice of counsel defense could be raised.

The Magistrate Judge also distinguished *Swafford* because, in *Swafford*, the defendant had initially asserted an advice of counsel defense, while in this case Wilson never has. The court finds this distinction to be immaterial because, in both cases, at the time of the disqualification decision both defendants had attempted to waive the defense. *Swafford* stands for the proposition that disqualification can be appropriate, even in the face of such a waiver. Indeed, the case for disqualification is even greater in this case than in *Swafford* because, in that case, the conflict of interest related to the defendant's potential loyalty to the firm, and the attendant implications on an advice of counsel defense. Here, the probability of a conflict of interest is even greater, where Neumann himself, not a member of his firm, is the attorney whose representation gives rise to a possible advice of counsel defense.

The court is also persuaded by the unpublished Sixth Circuit case of *United States v. Timmer*, No. 95-1441, 1995 WL 704186 (6th Cir. Nov. 29, 1995). The Sixth Circuit upheld the lower court's decision to disqualify counsel, noting that the fact that the defendant "may have been willing to waive any advice-of-counsel defense at a point

when he was still represented by [the disqualified counsel] is not dispositive." *Id.* at *2. The Sixth Circuit summarized the findings below:

> Based on the representations made to him, the magistrate found that Mr. Sullivan was likely to be called as a witness by the government even if not called by the defense; that Mr. Timmer needed independent counsel in order to make an informed decision on asserting an advice-of-counsel defense to the bankruptcy fraud charges; and that developments during the trial itself might well give rise to a need for Mr. Sullivan to testify even if the defense could not foresee those developments prior to trial. The magistrate found as a fact that the government was not simply trying to gain a tactical advantage by putting defense counsel out of play.

*Id.* at *1. These conclusions were upheld, despite the fact that none of the magistrate judge's concerns came to fruition:

> Although neither side found it necessary to call attorney Sullivan as a witness, as matters turned out, the magistrate had to decide the disqualification motion "not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when [matters] are seen through a glass, darkly." *Wheat*, 486 at 162. From the perspective of the magistrate on October 11, 1994, it was reasonable to believe that Mr. Timmer would benefit from the advice of an unconflicted lawyer in deciding whether to assert an advice-of-counsel defense, just as it is reasonable for the magistrate to view Mr. Sullivan as a potential witness.

*Id.* at *2. The same analysis applies here, where Wilson will benefit from the representation of—not merely a consultation with—an unconflicted lawyer and where the potential for Neumann to be a witness in this case is high.

The court also finds persuasive the court's analysis in *United States v. Matsa*, No. 2:09-cr-297, 2010 WL 4117548, at *1 (S.D. Ohio Oct. 19, 2010), a case in which the district court disqualified the defendant's counsel. In *Matsa*, the defendant was served with a grand jury subpoena duces tecum, to which his attorney, Mr. Tyack, helped him respond. The defendant was then indicted for charges of obstruction of justice based on his response to the subpoena. On the government's motion, the trial judge

disqualified Tyack because the defendant could potentially raise an advice of counsel defense, Tyack could be called as a witness, or Tyack could in effect function as an unsworn witness. *Id.* at *3-5. With respect to the unsworn witness issue, the court stated:

> In this case, Mr. Tyack's first-hand knowledge of any communications that he had with Mr. Matsa in connection to the September 20, 2006, letter and related circumstances may give Mr. Matsa an unfair advantage because Mr. Tyack would be in a position to implicitly testify before the jury by offering—at summation, for example—his interpretation of Mr. Matsa's conduct while under Mr. Tyack's counsel and representation as that relates to the criminal charges in this action. The Government, however, would have no opportunity to cross-examine Mr. Tyack. Alternately, without casting any aspersions on counsel, it is possible that the jury could conclude that Mr. Tyack's connection to the letter implicates him in the same criminal conduct with which Mr. Matsa is charged. In either case, the public's perception of the integrity of the proceedings or the fairness of the trial itself, or both, could be undermined.

*Id.* at *5. In this case, the Magistrate Judge distinguished *Matsa* because Wilson does not intend to assert an advice of counsel defense. (11/23/10 Order at 10.) However, the Magistrate Judge's conclusion does not take into account the implications of Neumann acting as an unsworn witness, even if Wilson were not to formally assert an advice of counsel defense.

As the *Matsa* court explained, "[a]n attorney acts as an unsworn witness when the attorney has acquired, through his relationship with his client, first-hand knowledge of facts that will be presented at trial." *Matsa*, 2010 WL 4117548, at *4 (citing *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993)). "In such situations, disqualification may be warranted even if the attorney is not called to testify." *Id.* In addressing this issue, the *Matsa* court cited to *Locascio*, which is a preeminent case on the unsworn witness issue, and is instructive in this case.

*Locascio* is an admittedly exceptional case, involving the well-known defendants John Gotti and Frank Locascio and their racketeering offenses for their involvement in the Gambino crime family. Nonetheless, its analysis of potential conflicts of interest when attorneys operate as unsworn witnesses is on point:

> Even if the attorney is not called, however, he can still be disqualified, since his performance as an advocate can be impaired by his relationship to the events in question. For example, the attorney may be constrained from making certain arguments on behalf of his client because of his own involvement, or may be tempted to minimize his own conduct at the expense of his client. Moreover, his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination. *See United States v. McKeon*, 738 F.2d 26, 34-35 (2d Cir. 1984) (requiring disqualification where attorney would be essentially acting as both an advocate and a witness); *United States v. Cunningham*, 672 F.2d 1064, 1075 (2d Cir. 1982) (upholding disqualification where an attorney would act as an unsworn witness for defendant); *Castellano*, 610 F. Supp. at 1167 (finding that attorney's appearance at counsel table would itself distort the factfinding process).

*Locascio*, 6 F.3d at 933.

Here, almost exactly as in *Matsa* and *Locascio*, Neumann's role as counsel to Wilson's businesses in connection with customer complaints and state agency inquiries regarding the very type of conduct alleged in the Indictment gives Neumann first-hand knowledge of the facts that will likely be presented at trial regarding the business activities of URS and ARS, and possibly ULS. This role would allow Neumann to provide unsworn and un-cross examined "testimony," e.g., during opening and closing statements and during witness examination, regarding the purposes and methods of Wilson's businesses. Additionally, as the Government intimated at the hearing, the court cannot imagine a trial in which at least some of the documents presented to the court, bearing Neumann's name, would not become part of the record at trial. The jury,

being aware of Neumann's involvement in Wilson's business affairs could logically draw one of at least two conclusions: either Neumann, as an officer of the court, endorses Wilson's conduct (and therefore it must be legal), or Neumann was himself actively engaged with Wilson in a fraudulent scheme (and therefore his current role as trial attorney is to cover it up). Either conclusion, of course, would severely impede the integrity of the proceedings and would prejudice either one party or the other. Such prejudice must be avoided.

Nor can this type of conflict easily be waived. As the Second Circuit explained:

> This is different from the situation in *Wheat*, since the conflict in *Wheat*—multiple representation—was a conflict inuring to the detriment of the accused. In such a case, waiver by the accused of the conflict can conceivably alleviate the constitutional defect, so long as the representation by counsel does not seriously compromise the integrity of the judicial process. When an attorney is an unsworn witness, however, the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired. Waiver by the defendant is ineffective in curing the impropriety in such situations, since he is not the party prejudiced. *See Cunningham*, 672 F.2d at 1074-75.

*Locascio*, 6 F.3d at 33-34. Thus, Wilson's waiver, even if valid, does not satisfy all of the court's concerns about Neumann's representation.

Finally, the court stresses that today's decision is not an indictment either of Neumann or his present representation of Wilson. The court does not imply that Neumann has committed any unethical act in his role as zealous advocate for Wilson in this case. Nor does the court imply that Neumann engaged in any illegal behavior in his representation of Wilson's businesses. The court merely finds that Neumann's active role in representing Wilson's businesses during the relevant time frame regarding issues at the heart of the Indictment gives rise to the unavoidable potential for a conflict

of interest related to both the availability of an advice of counsel defense and the possibility that Neumann will be an actual or unsworn witness. "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat,* 486 U.S. at 159 (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) and *Jones v. Barnes*, 463 U.S. 745 (1983)). In order to ensure the integrity of the trial and guarantee an effective advocate, the court must disqualify Neumann.

The court thus finds that, when considering the complete record, the Magistrate Judge clearly erred in denying the Government's motion to disqualify Neumann. The Magistrate Judge's order will be overruled and the Government's motion granted. Wilson will be given an adequate time to secure counsel.

## IV. CONCLUSION

IT IS ORDERED that the Magistrate Judge's November 23, 2010, "Order Denying the United States' Motion to Disqualify Defense Counsel Scott Neumann" [Dkt. # 41] is OVERRULED.

IT IS FURTHER ORDERED that the Government's motion to disqualify Attorney Neumann [Dkt. # 29] is GRANTED. Defendant Wilson shall have approximately five weeks to retain new counsel. By **March 29, 2011**, substitute counsel must file his or her appearance.

Finally, the court will conduct a status conference on **April 7, 2011, at 10:00 a.m.**

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: February 24, 2011

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, February 24, 2011, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C3 ORDERS\10-20581.WILSON.DisqualificationMotion.chd.2.wpd